14-4130 Hustler Cincinnati Inc v. Paul J. Cambria Jr. Argument not to exceed 15 minutes per side. Mr. Hynoski you may proceed for the appellant. Good morning, your honors. In the case of the court, Robert Hynoski, on behalf of the appellants, Jimmy Flint and Hustler Cincinnati Inc, I'd like to reserve two minutes for rebuttal, please. We respectfully submit that the district court erred in this case in granting summary judgment, removing this case from the jury, where there are abundant factual issues. And the briefs themselves in this case and factual record bear that out. We believe the district court erred in weighing the evidence, in fact in construing the evidence in favor of the defendants, the movements, and failing to grant us a reasonable evidence system which we're entitled to. This is a legal malpractice case that has, I believe, some deep factual particulars to it. There's no doubt in the defendants' admit that my client Jimmy Flint formed a professional attorney-client relationship with defendant Paul Cambria in the mid-1970s. My client's in his late 20s. He'd been in business with his brother for five or six years. They were living in Columbus, and they were indicted in Cincinnati on seven felony charges related to the publication of Hustler Magazine. But surely your client acknowledges that an attorney-client relationship once established doesn't last in perpetuity without parties sort of reaffirming that relationship through acts that would constitute a new relationship. I certainly agree with that. Where a lawyer undertakes a certain undertaking, that does not mean that that client's a lawyer forever. I understand that. In this case, the relationship started in connection with a very large, famous, national cover of criminal matter. Fast forward to the mid-to-late 90s, and a major motion picture came out that actually featured that trial as part of it. My client and his brother were played by the Harrelson Brothers. There was a premiere in Cincinnati, and that led to the opening of the first-ever Hustler retail store that was put in my client's name. This led to the second retention of Mr. Cambry on behalf of my client. There's reference in our brief to client number 11740, which we believe is very significant in the case. Bill Nipson's Green firm, like my firm, practically all firms, set up client ID numbers, client files. And when they undertook the representation of my client in the 70s, they created client ID number 11740, matter number one. That was the 70s case. The late 90s, they set up a second file, 11740, matter number two. And that was, again, the representation of my client. Mr. Cambry's professional relationship with the Flints, with Hustler, with LFP, started with my client. It's not as though he started as the company lawyer for Larry Flint. It wasn't as though he started as the company lawyer for Hustler, and then, you know, as a byproduct of that, my client just thought, well, he's my lawyer, too. He started as our lawyer. And then his relationship expanded, beginning in 2001, after the second criminal trial in Cincinnati. My client testified very clearly that after the second matter in Cincinnati in 1999, Mr. Cambry stayed in touch with him and essentially asked to get an opportunity to take on a bigger role. Mr. Cambry was a much more established lawyer at that point in time, again, primarily working in Buffalo and also in California. And he wanted to do more work. At that time, there were talks of expanding the Hustler retail division, which, in fact, happened. Multiple stores ended up opening across the 2000s. Can you answer this question? Jimmy testified that he understood Cambry's role to be corporate counsel to Hustler, replacing Eisenman. Yes? Certainly. Wait a minute. Here comes my question. Based on your theory, did Eisenman continue to represent Jimmy from 1999 to 2000, even after the end of Flint I and II? No, certainly not. No. Mr. Eisenman's firm ceased all communication, all involvement with either Larry or Jimmy, beginning in 2000 to 2001. What personal legal work did any of that perform for Jimmy? In addition to the criminal representation, it can be lost that my client's two criminal prosecutions and his ongoing criminal exposure, which also has been talked about as the criminal protection of Larry Flint, all arose out of their business activities. It wasn't as though Mr. Cambry's defense representation of Jimmy related to a theft or an assault battery or something disconnected from his business. Wasn't all the legal advice Jimmy received from Cambria related to Jimmy's position within HCI? It certainly was not. He certainly, as Jimmy, as the owner of HCI, got advice from Mr. Cambria related to that entity in Cincinnati. Can you point me to where in the record I would find a retainer agreement with Cambria including representation of Jimmy or HCI? If you can believe it, despite extensive factual discovery, the testimony from Larry Flint, Mr. Cambria, and others, is that there's not one shred of paper anywhere in the universe that defines the scope of a retainer agreement. So what we have in the record is a Buffalo, New York firm forming an oral yearly retainer agreement in or around late 2000 or early 2001 to cover, according to my client, the work for the business interests and the individual interests of Larry and Jimmy related thereto. So you acknowledge that there was not a retainer agreement with Mr. Cambria? There wasn't a written retainer agreement. But doesn't the record suggest that this Lou Serkin was the person who, in the 2000s, he was doing the legal work for and the representation of Jimmy during that time? The record would establish, and a jury could and we believe would find, that Mr. Serkin, who has a long relationship with Mr. Cambria, they're both prominent First Amendment lawyers, they have co-counseled many mayors across the country. Mr. Serkin's an Ohio licensed lawyer, a Kentucky licensed lawyer. Mr. Cambria's licensed in New York and California. Their firm, and the e-mails and record would reflect, has to utilize local counsel throughout the country, and they have over the last 15 years as they've put down a larger relationship. Mr. Serkin has provided work for Jimmy, has provided work for Larry. In fact, when Larry and Jimmy started to have a falling out, Larry, through the Lipsett Screening Firm, made it very clear to Mr. Serkin that Mr. Serkin was not to represent Jimmy because Larry Flint viewed Lou Serkin as his lawyer. In fact, there was motion and briefing in this court related to some deposition issues that were going on related to the California litigation. So Larry Flint took the position Lou is his lawyer, not Jimmy's lawyer. Throughout, Mr. Serkin served as co-counsel with Mr. Cambria in the late 90s criminal prosecution against my client Cincinnati. Our client's accountant testified that Lou Serkin was one of the lawyers for Jimmy and for HCI, as was Mr. Cambria, who lives at the Screening Firm. And the emails would reflect, and there's document 76-1, it's essentially 41 pages of select communications that we put together. It starts in 2001 and goes through 2009. And there's various emails in there between Mr. Cambria and my client Jimmy talking about Lou Serkin acting as local counsel, serving a local counsel role. First, I'd like to go back to Cambria. I mean, speaking with myself, I find the idea that there was a formal and term client relationship between Jimmy and Cambria very uphill. So that leaves the implied one, which is back in Tennessee. Again, it's only judgment that would seem to help you a little bit. But it's pretty obvious. I mean, there's no bill. There's no bill from Jimmy to Cambria. That would be an indicator implied. I still don't understand what the confidences are that Jimmy showed Cambria in the context of an implied relationship. So those are two pretty serious strikes. And you were just starting to talk about some emails. The emails I know about, they all can be explained most reasonably as emails that relate to the reality that Cambria is counsel to Larry and a big conglomerate. And Jimmy's an officer in the company. Of course he would be around this stuff. As to the expressed relationship, Jimmy's testimony, which has to be accepted at the summary judgment stage. I just said, I think the expressed one's really hard. You might have a shot at the implied one. Go ahead and talk about the expressed one and go for it. The implied certainly often signals that the implied one's the better one you might win on. Sure. Certainly all inferences have to go in our client's favor. And could a reasonable jury look at the pre-existing, long-standing relationship? You've already heard that. You've heard Judge Donaldson's response to it. An attorney and client relationship, one over implied, are matter-specific. Sure. Right? Those matters end it. And I agree that gives you an atmospheric, I don't even call it a relevant fact, because they knew each other and they worked together. But that by itself doesn't help you with the damage assignments you have to the 2000s stuff. If Jimmy was asked hypothetically in any of these relevant years, if we could just go back to 04, 05, 06, 07, and was asked by someone on the street, a stranger, someone he didn't know, Jimmy, who's Paul Cameron here? Could a reasonable jury conclude that his answer would be my lawyer, my long-standing lawyer? So I say you win on that. The problem is it's not just the subjective view of the client. It's whether that subjectivity is objectively reasonable. Certainly. So any plenty of evidence that Jimmy thought he was his lawyer, I'm not denying that, but that doesn't do the trick. There's a page ID 1302, an email from Mr. Cambria to Jimmy in August of 04, talking about a proposal for a reality show that they were talking about. And he said, you better include your lawyer there since I'm not part of the family. I'll pass it on to Joe, which is Joe Montazzi. And that makes it not fun. He isn't part of the family. Jimmy works for a family company. Mr. Cambria is the lawyer for the family company. And he says, you better include your lawyer. He's talking to Jimmy. Jimmy, you better include your lawyer in this pitch for the reality show. I should have a role in the TV show, basically, is what he's implying. Okay. Okay, so let's say you're right about that. Let's say that shows what? An implied twin-client relationship with respect to the reality show. That's not part of the implied damages, right? It shows the, you have to connect. Every time you find this implied twin-client relationship, you now have to link it to one of the three theories of damages. But that has to be taken in the context of, during this time period, Jimmy is literally, if you look back, signing away millions of dollars of assets through legal documents that the Cambria firm has drafted and presented to him for signature. And is it reasonable that during that circumstance, Jimmy believes these are my lawyers, our lawyers, putting together documents that are in the best interest of all involved? There's no place anywhere, I mean, a reasonable lawyer, would there be some document that said, Jimmy, we don't represent you anymore. We've taken on a role with your brother. You know, from now on, we don't represent you. None of that. So, let's just say you're right. That that gets you the implied relationship, for the sake of argument. Now link that to your damages and the transactions that in your view, I think you can show that weren't a lie from Jimmy's perspective. But you have to link it to, what did Cambria do? You say it's playing both sides. I've told him both sides. What was the thing he did that abused the confidence of Jimmy's and not what he had managed, let's say Larry? Sure. There's a perfect example, I believe, in an email that Mr. Cambria sent to Jimmy and others, October 19th of 2004, page ID 1303. This email says, we are going to transfer the property in Cincinnati, the building that Jimmy owned through Buster Cincinnati, to Larry. We're going to do that and we're going to try to insulate Larry from criminal exposure. Now what does that mean, insulate Larry from criminal exposure? It means to create criminal exposure for Jimmy. That's what you're doing. He goes on to say, what we need to do is to set up a... Did he have criminal liability rights in that transaction? There was another indictment, but there was only that exposure. So, wait, wait. This is not an exposure transaction. Mr. Cambria goes on in that email and says, one of the things we need to do for the Cincinnati store that Jimmy's owned forever is that that company needs to start paying the licensing fee, which they hadn't paid for five years, because that will show, if we ever have to show the prosecutor in Cincinnati that Larry was disconnected, it's a licensing arm's length situation. So he needs to start paying the licensing fee. That happened. Right after that, they started paying the licensing fees from Cincinnati to California. That action was used in Larry versus Jimmy's litigation against each other, against Jimmy, to show that Jimmy became a licensee, an implied licensee to Larry, and he lost all rights to the use of the Hustler name. And this court affirmed that and held that accordingly. Had Jimmy never began paying the licensing fees, it could have never been determined in Jimmy versus Larry's litigation that Jimmy lost all rights because of Judge Berkman and his court. But what was Cambria doing in his capacity as a lawyer? He was telling Jimmy he needs to start paying. It's not fair to Jimmy. It's in his capacity as a lawyer as opposed to a businessman or what's a good... He's saying, Jimmy, you own this business. You need to start paying the licensing fee to your brother to protect your brother criminally. He didn't explain, oh, by the way, by doing that, if things ever go awry with you and your brother, you're paying them these licensing fees or they're going to come back to haunt you. And they did. They came back to bite him. They came back to make him lose his business name. Why shouldn't he pay licensing fees? Because he had used the name first, first, which is trademark rights. But we're not even talking about passing the result. Correct, but that was all how the court got to that decision was the chronology of Jimmy starting to pay, and Judge Bergman said the relationship between Jimmy and Larry changed in 0405 when he started to pay licensing fees. And that was used throughout the Jimmy and Larry litigation against Jimmy to take away his rights. Okay, and so on that score, I'm not sure I understand this. You're saying that Mr. Cambria's actions, they are, that because Jimmy believed that this was advice from his, Jimmy's lawyer, he didn't seek independent or he didn't question this, and it resulted in a loss of rights and property and adversely affected him going forward. Exactly. When you fast forward to 2009 and then the litigation between Larry and Jimmy. So your argument is this is another instance where Jimmy's subjective belief and Cambria's basic, I guess, confirmation of that belief shows that there wasn't a pretty fine relationship. Absolutely. The e-mails reflect that. But for Cambria, the theory is Jimmy was not paying licensing fees for Betty. And as we now know, things fall apart. Larry says you are going to pay licensing fees and there will be litigation because this is what the two of you guys now sell, more of that and Yosemite. Litigation, you're going to get everywhere. And Larry wins. Okay? Party of damages. Because if Jimmy would have had independent legal advice during that time period. I'm saying it would have happened anyway, is my point. I wonder what scenario this Larry not insist on licensing fees. How's he going to get them? In the context of retail, Jimmy was the first to use Hustler in retail. That created his rights. You're not, you're typically arguing the last case. But I'm saying the chronology, what happened, the mineral store. Jimmy owned the store. Now we're on to the theories. It's all part and parcel. No, you have three different claims. It's sovereign real estate, it's the licensing fees and Monroe. And you have to link something Cambria did except that there's an alternate violation. You have to link, you have to have causation, and then you have to get through the one year limitation. Cambria didn't tell Jimmy. As Jimmy was transferring everything he basically had in his name to his brother. Jimmy, you ought to document your relationship and get some protection in writing with your brother. Or you ought to see an independent lawyer to protect yourself. Because you know what, if things go awry in five years, you're going to have nothing. And that's what happened. Jimmy's 67 years old, he doesn't have Social Security. Larry's got hundreds of millions of dollars. Lipscomb's dream is to make a million five-year entertainment agency. Jimmy's the one that got ousted. And he was set on those fees. It came from Larry. It came from the organization that tested money. For which Jimmy worked. Correct. But for a period of time, he was an owner. He owned more than he did ultimately when things went awry. And when things went awry in 2009, as our attorney experts explained very articulately, Jimmy didn't have a lot of ammunition. He didn't transfer everything over. Years earlier, he was told by his lawyers that he had had a relationship with him since the 70s. So let me just make sure the Monroe story should not have sold. Absolutely should not have. Without some document giving Jimmy some long-term protection. He was making $6 million a year in revenue, netting about $2 million. Our expert values it at $7 million in 2005. Which is unchallenged to the record. And Jimmy gives it to Larry for nothing. Right, right. I know. These all just seem to be bad business decisions. Terrible. Turns out voters are really welcome. How great are voters at managing businesses? That's not their expertise. That's business law. And when you have legal malpractice, you don't come after them because they're not giving good business advice. Oh, and they're planning to come back for business advice. If they have a... Look, there's a screen for this. Tax lawyers, corporate lawyers, they're the ones putting together all these transactions, these intracompany transactions. And you have an obligation as a lawyer to, before someone signs away their life, you have an obligation to say, hey, put the brakes on here. I mean, Jeff Stern, our attorney expert from Columbus, who's one of the most regarded experts in legal standards, former disciplinary counsel in Ohio, he testified for seven hours for 300 pages, not an outline. Look, when you're involved in a family business, a business of family members and brothers, and you're all of a sudden doing intracompany deals and transferring assets for protection or to get a loan or for commercial purposes, you can't just let one of those person's hang-ups dry. Now, I know in 2009 and beyond when we litigated the other case, things were different because Jimmy had no eggs in his basket at that point in time. He had a lot of eggs in his basket when Mr. Camry and his firm took on a larger role. If you go back to 2001, for example, Jimmy owned two of the three Hustler retail stores, including the two in Ohio. He had a great relationship with his brother, making lots of money. And then he fast-forward over the next three or four years, and he starts to pay a licensing fee, and he starts to double his rent, and he transfers his building, transfers them in real estate. And then, a couple years later, things go awry. And the worst part, when things go awry, Phillips's green firm starts to take the offensive against him. They advise and take action to try to evict him from the last business he owned at that time in Cincinnati, Hustler Cincinnati. They try to take away his rights to use the Hustler name under trademark infringement theory because he paid licensing fees. And they're reversed. They say, you're not an employee because you've got no document running with your brother. The red light's gone. We're wild. I'm sorry. Keep going. I'm sorry. I'm sorry. Take your time on that. All right. Thank you. Ms. Johnson. Nick, thank you so much. I'm Beth Brown from TAP, Cincinnati. I'm an attorney for the Appellate League for Defendant Attorneys. I want to start off my argument by addressing one of the questions that Judge Sue Hardy asked her counsel here. And the question was, what personal legal work did the Defendant Attorneys do for Paul Cambria? And all they pointed to was the criminal representations in 1998 and in the 1970s. Jimmy Flint was asked during his deposition, what personal legal services did you need from 2001 to 2009? And his response was, I only needed assistance in the divorce. And his testimony, in our case, related to the divorce deposition was that he discussed it on a private matter a couple of times with Paul Cambria, but he didn't provide any legal advice. That's page 133 of his deposition. He asked about the implied attorney-client relationship. And he stated, you need to have a belief that the Defendant Attorneys were representing the plaintiffs and that belief had to be objectively reasonable. The testimony in this case is that in 2003, Jimmy Flint was asked under oath in the divorce deposition. Judge Sutton, you might remember that deposition because during the last argument, counsel admitted that Jimmy Flint lied under oath in that deposition or argued that he lied under oath in that deposition as to his ownership of the Hustler retail stores. But in that deposition, he was asked, sir, who handles your corporate legal matters? And his response to that question was, who's serving? Now this is at a time when he's arguing that Defendant Attorneys were representing him and serving as his corporate legal counsel. Counsel would never explain why Jimmy stated under oath that Lou Serkin was handling his corporate legal matters. And he just argued that if somebody had asked him on the street, who was your lawyer, he would say Paul Cambria. But the evidence in the record is that he said it was Lou Serkin. The evidence in the record shows that Lou Serkin helped him in all three of these transactions down the street, Monroe and licensing. Was he involved in all three? He was involved in the transfer of the stock sale and he was involved in the sale of the building and the licensing of the building. The evidence for the Monroe store is not 100% clear whether he was involved. But there would be... So what if he did? Did Jimmy have another lawyer? With the Monroe store, the evidence is from Lou Serkin helped him get that store started, filed an order with a separate corporation, and there's receipts showing that he was providing continuing work for that store on behalf of Jimmy Edwards. We didn't... Because of the way the structure was in the case, we didn't get unredacted legal bills showing exactly what Lou Serkin was doing at that time. But Lou Serkin... From the time... Lou Serkin first came into the picture in 1998 in the criminal insanity cases. And the record is clear. From the time that case ended until 2009, Lou Serkin and his firm was representing the plaintiffs continuously. There's unredacted legal bills. They're in Jimmy's deposition at page 14. I'm sorry, they're redacted legal bills. And they show a monthly run showing that they were serving as corporate counsel working on all kinds of matters for the plaintiffs. Jimmy was arrested in 1999 on a possession charge. This was shortly after he was... The plea deal was ended in the case. Lou Serkin served as attorney there, and that's in the record as limit 12 in Jimmy's deposition. As for the Monroe store specifically, the court has ruled the true owner of that store was Larry Flint. That's in the second trademark opinion. And what the court said was, in light of our partnership... In light of my ruling in the partnership case, the true owner of the Hustler retail stores... Hustler Cincinnati was... Hustler Hollywood retail stores, excuse me. Hustler Cincinnati was not a Hustler Hollywood store. The true owner was O.E. Larry. Jimmy's client was not from or he may have any damages related to that store. He wasn't the true owner of the Monroe store. There is information in the record about the expert reports that there was a summary of facts that suggested the existence of an attorney-client relationship, notwithstanding that there's been no written retainer or anything like that in the record suggesting this. But the expert did state that the summary of facts was consistent with his review of the existence and determination that an attorney-client relationship existed. In light of all of the factual things that have come out here and the expert reports, why isn't this evidence a material issue of fact which would make summary judgments inappropriate? Why shouldn't this go to a fact finder? Sure, there's a couple of reasons. First, the district court took into consideration the statement that the experts had reviewed the entire record. And what they said was, I reviewed the entire record and it doesn't support the assumptions in that report. If the record revealed those information, counsel would have pointed to the record instead of to their expert reports. Instead of saying, my expert found it in the record but I'm not going to tell you where it is myself. The other thing is, and this court has addressed this question in Hirsch v. CFX Transportation, Inc. The question of, if you have an expert report, does that automatically get you past summary judgment? Judge Sutton, you were on that panel. In that case, it was a train wreck and the plaintiff had four experts that were testifying as to medical monitoring and the need for medical monitoring. And what the court said was, their expert reports were based on assumptions and speculations that aren't supported by the record. And as a result, that doesn't rise above the mere scintilla of evidence that's required to get past summary judgment. In this case, we have the exact same thing. An expert report that's based on assumptions and speculations. Judge Sutton, you asked about the confidential information that was shared by Jenny and defendant attorneys. Their expert, Jack Scott, was asked specifically what confidential information did Jenny share with the defendant attorney? And his response was, I don't know, I can't point to any. We pointed this out in our memo in opposition. The response was, in pointing to his deposition, there must have been some confidential information shared. It's just an assumption. There is no evidence in the record to support that. If you're asking me the case, I guess this is really provocal for you, but when it comes to implied attorney-client relationships, I guess I'm a little surprised this is an issue susceptible to expert reports. And I don't really understand why. This is not a medical case where lawyers and judges have jurors who have no idea what they're talking about. The question is basic things like were confidences shared? Did you build? Was there legal advice? Most of the expert reports, in the public respect of people, I found them just to be very useful summaries of the law by attorney-client privilege, but that's usually what the lawyers provide. So what does the law say? Does the law say, well, this is a very tricky fact question, so expert opinion is useful, and it crosses the barrier, and it's okay? I'm not aware of all that answers the question, because what the experts are pointing on is the fact question that's for the jury. Normally, in a legal malpractice case, the expert is justifying and is required to testify that there was a breach of the duty. So they violated some ethical rule, and that's normally the framework for the expert. In order to have that testimony, you obviously have to establish the existence of the attorney-client relationship. So they ask them to assume that the attorney-client relationship existed and then opine as to whether there was a breach of the duty. Here, they're kind of trying to backdoor in the first element by pointing to my expert has determined this. In Jeff Stern's report... Just out of curiosity, are there cases that say, as to the first issue, whether there's an attorney-client relationship, that's something you get expert testimony? I'm not aware of any cases. You're not aware either way? No. The case is, you're required to have expert testimony to satisfy the second element. Right. Right. Can I take you back to June of 2001? Sure. The opposing counsel is arguing today that that's the pivotal time period. That's where the replacement lease and the new licensing agreement from Monroe took place. I understand Gavinkowski drafted the agreements, sent them to Jimmy for execution. Jimmy recalls discussing the agreements with Cambria, and I think the argument is those were one-sided in Larry's favor and were used to dilute or diminish Jimmy's future role and protect Larry from criminal prosecution. If all that is, in fact, true in the record, shouldn't there have been some advice for Jimmy to obtain independent counsel, at the very least, at that point? I'm going to assume that all that is true. Jimmy had independent counsel. Jimmy Flint had Lou Serkin serve as his counsel continuously from 1999 until 2009. That's not disputed. But he was not involved in this deal? No. Lou Serkin was working and it's in the record. Lou Serkin was working on Monroe and providing legal services to Jimmy Flint at Monroe during this time. He helped form that sort and he continued working on it. And those invoices are in the record and they were paid, Lou Serkin, for those services. In contrast, the record is very clear. There is not a single legal bill that was sent from the defendant attorneys to any of the plaintiffs. So Lou Serkin was paid out of Hufford Cincinnati? Lou Serkin was paid out of Hufford Cincinnati. Yes, they were paying those bills and they were issuing 1099s to Lou Serkin. They issued none to the defendant attorneys, ever. You asked about the damages in this case and that's important to hear too. The damages arise from Jimmy's claim that he had lifetime employment. He's formally stopped arguing he had lifetime employment. The court has already determined that he did not have that in the litigation with Larry. You asked about the licensing fees and counsel stood up here and said repeatedly that Paul Cambria advised him to pay the licensing fees. Jimmy offered a declaration in the litigation with Larry in 2011. It's in the record of 179 in that litigation and this is exactly what he said, paragraph 28. At no time was I ever told by Larry, LFP, Inc., or any of their representatives which would include their attorneys that I, Hufford News and Gifts, Inc., or Hufford Cincinnati, needed to pay any money or anything else of value to use the Hufford name and mark. That testimony was given. I wasn't advised to pay licensing fees at a time where they've already sued the defendant attorneys alleging that they were advised to pay licensing fees. The United States Supreme Court has ruled that if you offer statements on your own, you cannot offer later self-serving conflicting testimony to survive summary judgment. That is Cleveland v. Policy Management Systems Corporation. That case is from 1999. It's 119 in court 1597. We have repeated conflicting testimony given under oath by Jimmy earlier in time that the defendant attorneys did not represent him, did not advise him on the matters that he's claiming give rise to illegal malpractice, and he hasn't explained why he gave that testimony and why he's giving conflicting testimony now. This is not particularly relevant to what you just said, Martha. Tell me, when the first indictment came down here in Ohio... I'm sorry, I don't want to interrupt you. The 1976 one, the 1990 one, or the 2012 one... Let me just forget that for a moment. I have to ask you, when Jimmy first needed counsel, it was Larry who hired counsel for Jimmy, correct? Sure. Jimmy was indicted in the 1960s. He was indicted based on his role as an employee of Larry's. And so when did Cambria come into the picture again? He came in in the 1970s. He represented Jimmy in the Court of Appeals... I'm sorry, the Common Pleas case on obscenity charges. And at that time, he argued to the jury his opening statement is in the record of his declaration, Exhibit A, that Jimmy was just Larry's brother and that's why he's been indicted. Jimmy was acquitted on those obscenity charges. Larry was convicted. Paul Cambria represented Larry on the appeal and then continued to represent Larry in criminal obscenity charges all over the country and not Jimmy during that time. He stopped representing Larry shortly after he was shot in 1970 and didn't have any contact with either one of them for 20 years. And that's in the record of Jimmy's deposition, page 14. You asked about the continuing representation though, and I do want to point this out because Jeff Stern testified that even though there was no contact for that entire 20-year period, the attorney's time relationship continued because Paul Cambria didn't tell him he was done with our relationship. There wasn't a formal ending. So he suggested that that relationship was, in fact, indefinite. I also want to point out... Given that the implied kind of time relationship is very fact-driven, and this is something in judgment, and we don't need a personal judge for this, but I just wonder why a better way to think about this case is to just look at each theory of breach, damages, ask yourself whether there's causation given the other litigation, and what's left and what's not, and just handle it that way. And that way... I don't know. The implied term, implied relationship, there's an awful lot of evidence all over the place on this one. It's a long period of time, and it's just over this prior issue of fact. Well, Your Honor, that's an excellent point. We briefed all three issues for the will report, all three elements. We also briefed the question of statutory limitations, which is a very serious problem in this case. The claims that they're alleging, for the most part, other than Jimmy's firing, ended in 2006. The building was finally transferred in 2006. They didn't bring any more suits until 2009. The record is very clear. Judge Bertelsmann said it. Whatever the relationship was between Jimmy Plant and Larry Plant, Jimmy was aware as late as 2006 that that relationship had ceased. So we briefed the other issues as well, and those provide an alternative ground for evidence before this Court. We didn't get into the statute of limitations, but they've argued that because there was a continuing representation, that that told the statute of limitations, and that's not the ball. They would have to show that there was some work, continuing work, being done related to the sale of the building or vice of the building. Something else was done between 2006 and 2009 that told the statute of limitations. We don't have that. Thank you very much. Judge Zahara, you asked Ms. Bryant about June 2001, which made a big point up in our briefing, and you referenced the letter that Mr. Domkowski sent to Jimmy Flynn, closing those two documents for his execution. And you'll note it was Paul Camden. Lou Serkin's non-copy. So if Lou Serkin was involved with that deal, why wasn't he involved? Why were the documents going straight to Jimmy? There is not one piece of evidence in this entire factual record that Lou Serkin was involved in those contracts. Or that he didn't do about it. Which one are we talking about? June 2001. June 2001. You said there's nothing. I thought counsel on the other side said there were bills, there was evidence that Serkin had helped on some amount of work. He had helped set up the corporation years ago, filed the paperwork with the State of Ohio, Secretary of State, to establish the entity. But when it came to these two agreements, which were literally the first work done by the Cambridge firm once they took that broader relationship, that netted $100,000 a month going out of that store back to California, Lou Serkin had zero involvement. So if I look for his bill in the record, I will not find references to June 2001 in this deal. Absolutely not. And the notion, what's the damage that grew out of the Monroe transactions? Explain that. For that period of time, 01-05, That one is 1904. 01 to late 04, when Monroe's stock transfers. During those four years, these two contracts resulted in Monroe sending profits of a million to a year to Larry, to California, where they could have been Jimmy's. That started happening in 01-04. It started happening in 01, immediately after he stopped. Why would a cause of action start in one year? Because the recognizable event, which Judge Berman even said this during the hearing, clearly was not until mid-2009 when Jimmy all of a sudden realized that he's being ousted, that these documents that were he thought in his best interest are being used against him. At the time, he was told it was all part of his overall relationship with his brother, that he was protected, and in terms of causation, if he would have had independent legal advice during these years, he would not have suffered the catastrophic losses that he suffered in his case against his brother. And he wouldn't be where he's at right now. And Blue Serpent was never an independent lawyer. He was always Larry's lawyer. Heading up on folks' accounts this time, but assuming this all ends in a war, and he should have known, is there any toll in there to apply? Statute of limitations run from the termination of the eternifying relationship or the happening of a recognizable event, whichever occurs later. It's fact-intensive, and the evidence would show in his case that until 2009, Jimmy had no reasonable belief to think that his lawyers had essentially taken him down a criminal's path, and now were essentially cutting his legs off from underneath him. But I mean, maybe I'm missing something, but I thought when you and Judge Donnelly initially were talking, you both were believing that a termifying relationship is a decline in criminal charge by criminal charge, real estate transaction by real estate transaction licensing, so you can't respond to Judge Larry's question by just referring to the general relationship in criminal practice. But it's either the termination relationship or the recognizable event, whichever is later. Whichever is later. So you can have a termifying relationship end today, but you don't know until maybe five years from now when you're facing a foreclosure or some catastrophic event from a bank that your lawyer messed up the paperwork five years ago. The statute of limitations doesn't begin to run. Okay, so on one we agree that the termifying relationship wasn't continuing into the back of 2009, so the thing for us to consider is whether it was a ten-month school event. Sure, whether the money that was being sent to Larry at that point was a ten-month school event. That's what we have to figure out. And that Jimmy shouldn't have realized then that he was essentially being set up for failure if he and his brother's relationship wasn't settled. Okay. Thank you for your time. I think we've got it. Thanks so much for your helpful briefs, both of you. It's going to be a helpful hour. Thank you. I appreciate it. The case will be submitted for public appearance. Thank you.